1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9
## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| FOSTER POULTRY FARMS, et al., | ) 1:04cv5930 REC DLB |
| | ) |
| | ) |
| | ) ORDER DENYING DEFENDANTS' MOTION |
| Plaintiffs, | ) TO DISQUALIFY AND FOR PROTECTIVE |
| | ) ORDER |
| v. | ) (Document 69) |
| | ) |
| | ) ORDER GRANTING PLAINTIFFS' MOTION |
| AISLIC, et al., | ) TO COMPEL |
| | ) (Document 46) |
| | ) |
| Defendants. | ) ORDER IMPOSING SANCTIONS |
| | ) |

17

18      Defendants American International Specialty Lines Insurance Company and AIG

19   Technical Services filed the instant motion to disqualify on June 1, 2005.  The motion was heard

20   on July 8, 2005, before the Honorable Dennis L. Beck, United States Magistrate Judge.  Plaintiffs

21   Foster Poultry Farms' and Foster Dairy Farms' motion to compel, filed on May 20, 2005, was

22   also heard at that time.  Martin H. Myers, Barry S. Levin and Timothy Jones appeared on behalf

23   of Plaintiffs Foster Poultry Farms and Foster Dairy Farms.  James P. Wagoner and Anthony L.

24   Osborn appeared on behalf of Defendants American International Specialty Lines Insurance

25   Company and AIG Technical Services.

26
27
28

1

1

**BACKGROUND**

2        Plaintiffs Foster Poultry Farms and Foster Dairy Farms (collectively "Plaintiff") filed this

3 action in the Fresno County Superior Court on May 28, 2004.  Defendants American

4 International Specialty Lines Insurance Company ("AISLIC") and AIG Technical Services (now

5 known as AIG Domestic Claims, Inc., or "AIGDC") (collectively "Defendant") removed the case

6 to this Court on July 6, 2004.

7        On September 23, 2004, Plaintiff filed a First Amended Complaint ("FAC").  The

8 allegations in the FAC arise out of an Employment Practices Liability Policy issued to Plaintiff

9 by AISLIC.  Plaintiff contends that Defendant has engaged in a wrongful pattern of obstruction,

10 designed to delay payment of a claim covered by the policy.  Plaintiff states causes of action for

11 breach of contract, breach of the implied covenant of good faith and fair dealing, fraud,

12 intentional interference with contract, and conspiracy.

13        Pursuant to the October 8, 2004, Scheduling Conference Order, the non-expert discovery

14 deadline is August 15, 2005 and the expert discovery deadline is September 22, 2005.

15 Dispositive motions must be filed by September 9, 2005.

16        Plaintiff filed the motion to compel on May 20, 2005.  The motion requests that

17 Defendant be compelled to produce (1) AISLIC 30(b )(6) witnesses and (2) Kathleen Brady,

18 claims representative for AIGDC, for depositions.  Defendant filed its opposition on June 1,

19 2005, and Plaintiff filed its reply on July 5, 2005.

20        On June 1, 2005, Defendant filed its motion to disqualify Plaintiff's counsel and for a

21 protective order.  Plaintiff filed its opposition to the motion to disqualify on June 29, 2005.

22 Defendant filed its reply on July 6, 2005.

23                          DEFENDANT'S MOTION TO DISQUALIFY

24        Defendant moves to disqualify the firm of Heller Ehrman, LLP ("Heller Ehrman") from

25 further representation of Plaintiff based on its alleged violation of California Rule of Professional

26 Conduct 3-310.  Defendant also moves for a protective order precluding Heller Ehrman from

27 conducting or obtaining discovery from Defendant.

28

1   A.      Factual Background

2   _____AIG, Inc. is an insurance holding company, and is the direct or indirect parent of

3   numerous insurance companies, including AISLIC and National Union Fire Insurance Company

4   of Pittsburgh PA ("National Union").  AIG, Inc. is also the indirect parent of AIGDC, which

5   administers claims made under policies issued by AIG, Inc. members, including AISLIC and

6   National Union.

7       Heller Ehrman has represented AIG insureds in two relevant circumstances: (1) where it

8   represents a corporate director or officer in a lawsuit that could be covered by a D&O policy

9   issued by National Union; and (2) where it represents an employer in a lawsuit that could be

10  covered by an Employment Practices Liability Insurance ("EPLI") policy issued by AISLIC.

11      National Union's D&O policies disclaim any duty to defend, but impose a duty to pay the

12  insured's cost of the defense, subject to certain conditions.  Since 1992, Heller Ehrman has been

13  included on the Panel Counsel list attached to National Union's D&O policies.  It was removed

14  in August or September 2002, but was reinstated to the Panel Counsel list in March 2004.[1]

15      AISLIC's Panel Counsel list for EPLI policies does not routinely include Heller Ehrman,

16  but AISLIC has approved the firm at the specific request of certain policy holders.  Under

17  AISLIC's standard EPLI policies, the insurer also disclaims any duty to defend.   The Foster

18  Farms EPLI policy at issue in this litigation departs from this, but even under that policy, AISLIC

19  disclaims any duty to defend and/or duty to pay defense costs until the insured has expended a $1

20  million self-insured retention.

21      Claims under National Union's D&O policies and AISLIC's EPLI policies are handled by

22  claims representatives in the Financial Institutions Department of AIGDC.

23      Heller Ehrman has represented policyholders in coverage disputes against AIG companies

24  since at least 1980.  Defendant identifies numerous cases in which Heller Ehrman represents,

25  either previously or currently, insureds of AISLIC and National Union.  To the extent these cases

26  are relevant, they will be discussed in the Court's analysis.

27  _____

28          [1] The circumstances which led to Heller Ehrman's reinstatement are recalled differently by the parties and
    will be discussed in the Court's analysis.

1    The underlying matter which gave rise to the instant action, Parker v. Foster Farms, was

2    an employment discrimination case filed in Fresno County Superior Court in March 2002.  The

3    case was eventually settled in December 2002.  During the litigation, Plaintiff, represented by

4    Heller Ehrman, turned to AISLIC to cover its costs and settlement under a $50 million EPLI

5    policy.  AISLIC indicated in October 2002 that it was denying coverage and in November 2002,

6    by way of a letter refuting the denial of coverage, Heller Ehrman alerted AIG that it would be

7    representing Plaintiff as coverage counsel.  By December 2002, AIG had retained its own

8    coverage counsel.  After efforts to mediate failed, this suit was filed in May 2004.

9    Defendant explains that it first learned of the alleged conflict while preparing Zachary

10   Fisher, a claims representative in the Financial Institutions Department of AIGDC, for

11   deposition.  Declaration of James P. Wagoner ("Wagoner Dec."), ¶ 4.  Plaintiff served the notice

12   of 30(b)(6) deposition on April 13, 2005, and sought information and documents dealing with

13   claim handling.  The deposition was set for May 12, 2005.  On May 11, 2005, during Mr.

14   Fisher's preparation, Mr. Wagoner first discovered the alleged conflict.  On May 11, 2005, Mr.

15   Wagoner contacted Mr. Myers while he was at the San Francisco airport, and demanded that

16   Heller Ehrman withdraw as counsel.  Mr. Myers refused and continued traveling to New York

17   City.

18   On May 12, 2005, Mr. Myers and Mr. Wagoner appeared for depositions.  However,

19   there was no witness.

20   B.    Legal Standard

21   "A trial court's authority to disqualify an attorney derives from the power inherent in

22   every court '[t]o control in the furtherance of justice, the conduct of its ministerial officers, and

23   of all other persons in any manner connected with a judicial proceeding before it, in every

24   manner pertaining thereto.'"  Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp., 36 Cal.App.4th

25   1832, 1837-38 (1995) (citations omitted).  "The issue of disqualification 'ultimately involves a

26   conflict between the clients' right to counsel of their choice and the need to maintain ethical

27   standards of professional responsibility.'"  Id. at 1838 (quoting In re Complex Asbestos

28

4

1    Litigation, 232 Cal.App.3d 572, 586 (1991)); Comden v. Superior Court, 20 Cal.3d 906, 915,

2    (1978).  When deciding a motion to disqualify,

3
        the court must weigh the combined effect of a party's right to counsel of choice, an
4        attorney's interest in representing a client, the financial burden on a client of replacing
        disqualified counsel and any tactical abuse underlying a disqualification proceeding
5        against the fundamental principle that the fair resolution of disputes within our adversary
        system requires vigorous representation of parties by independent counsel unencumbered
6        by conflicts of interest.

7    United States v. Bell, 79 F.Supp.2d 1169, 1174 (E.D. Cal. 1999) (citations omitted).

8    C.    Analysis

9
          Defendant first contends that an attorney-client relationship exists which warrants
10
    disqualification.  If the Court does not find an attorney-client relationship, Defendant urges the
11
    Court to disqualify Heller Ehrman based on an expectation of fidelity.
12
13        1.        The Existence of an Attorney-Client Relationship

14        Defendant argues that Heller Ehrman should be disqualified based on its alleged violation

15   of California Rule of Professional Conduct 3-310, which provides as follows:

16        (C) A member shall not, without the informed written consent of each client:
17        . . .
        (3) Represent a client in a matter and at the same time in a separate matter
18        accept as a client a person or entity whose interest in the first matter is adverse to
        the client in the first matter.
19
20        (E) A member shall not, without the informed written consent of
        the client or former client, accept employment adverse to the client
21        or former client where, by reason of the representation of the client
        or former client, the member has obtained confidential information
22        material to the employment.

23        However, as Defendant recognizes, the first hurdle to the application of Rule 3-310(C) or

24   (E) is proving the existence of an attorney-client relationship between Heller Ehrman and an AIG

25   insurance company.  Defendant asserts two bases for finding an attorney client relationship: (1)

26   Heller Ehrman's status as Panel Counsel, "assurances" given by Heller Ehrman, and Heller

27

28

Ehrman's receipt of the AIG Companies Litigation Management Guidelines; and (2) actual cases in which Heller Ehrman is involved.

a. *Panel Counsel, "Assurances," and the Litigation Guidelines*

Defendant first argues that an attorney-client relationship exists by virtue of (1) Heller Ehrman's inclusion on the Panel Counsel list for National Union's D&O policies and certain AISLIC EPLI policies, (2) the "assurances" given by Heller Ehrman shareholder Norman Blears to Anthony Santoro, Vice President, Financial Lines-Litigation Management and Panel Counsel for AIGDC; and (3) Heller Ehrman's receipt, without objection, of the AIG Companies Litigation Management Guidelines ("Litigation Guidelines").  These factors, when considered alone or in combination, however, do not give rise to an attorney-client relationship.

Defendant argues that Heller Ehrman's listing as Panel Counsel, which allows an insured to chose Heller Ehrman to represent it and requires AIGDC and AIG, Inc. companies to accept the choice, is the equivalent of a preliminary consultation by a prospective client to which the attorney-client relationship extends.  Defendant is correct that an attorney-client relationship can begin as early as the preliminary consultation, but certainly not under the circumstances here.

First, it is an incorrect assumption that Heller Ehrman's status as a firm included on the Panel Counsel list somehow translates into a preliminary consultation between Heller Ehrman and National Union, AIGDC or any other AIG, Inc. company.  A preliminary consultation impliedly creates an attorney-client relationship only when legal advice is sought and retained.  See Beery v. State Bar, 43 Cal.3d 802, 811 (1987) ("When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established prima facie.") (citations omitted).  Here, there is no evidence that AIGDC or any AIG, Inc. company sought legal advice from Heller Ehrman, or that Heller Ehrman gave legal advice to these entities.  That Defendant is bound to accept the insured's choice does not change this result.

Second, Defendant is hard-pressed to argue that Heller Ehrman's inclusion on the Panel Counsel list overcomes the general rule that an insurer's duty to pay defense costs does not translate into an attorney-client relationship.  When an insurer does not hire counsel or undertake

6

1   the defense, such as in the policies at issue here, the insurer is not the client.  <u>National Union Fire</u>

2   <u>Ins. Co. of Pittsburgh, Pa. v. Stites Prof'l Law Corp</u>., 235 Cal.App.3d 1718, 1727-1729 (1991).

3   In <u>Stites</u>, the court first distinguished the nature of the relationship where the insured has a duty

4   to defend, rather than just a duty to pay.  The court explained,

> [i]n the usual insurer-attorney-insured relationship, the insurer has a duty to defend the insured and hires counsel to provide the defense. The insurer controls the prosecution of the defense. So long as the interests of the insurer and the insured coincide, they are both the clients of the defense attorney and the defense attorney's fiduciary duty runs to both the insurer and the insured.

<u>Stites</u>, 235 Cal.App.3d at 1727.  The Court further explained that this is not the case where the policy does not impose a duty to defend, but only a duty to pay.  "The insurance policy in the present case imposed no duty to defend upon National. Rather, it provided that National would indemnify the Bank for losses incurred by it, including attorney's fees, in the defense of actions against its officers and directors."  <u>Id</u>.  Although National retained "limited control" insofar as the policy provided that no defense costs could be incurred without National's consent, that National and the insured must agree upon the defense attorney to be employed, and that National's consent to contesting an action against an insured must be obtained, the policy primarily obligated National to reimburse the insured for the cost of the defense.  <u>Id</u>.  National's duty to indemnify ran to the insured, and the insured's counsel's duty to defend ran to the insured.  <u>Id</u>.  Under these circumstances, the insured's counsel "was not hired by and had no duty to act as an attorney on behalf of National. Under the provisions of the insurance policy issued to the Bank, National had no right to actually control the litigation of the defense."  <u>Id</u>.  The court explained,

> [t]hese facts do not coincide with the usual tripartite relationship of insurer-attorney-insured where the insurer, in fulfillment of its duty to defend, hires defense counsel and controls the prosecution of the defense.

<u>Id</u>. at 1728.

1    <u>Stites</u> is controlling under the circumstances of this case.  The policies at issue impose

2    only a duty to pay for the insured's defense costs and specifically disclaimed any duty to defend.[2]

3    Under these policies, and the policies at issue in the specific engagements identified by

4    Defendant (which will be discussed in more detail below), AIG did not undertake the defense,

5    did not retain Heller Ehrman, did not control the defense, and did not participate in any strategic

6    decisions so as to alter the conclusion that Heller Ehrman was not in an attorney-client

7    relationship with any AIG, Inc. company by virtue of its inclusion on the Panel Counsel list and

8    subsequent representation of National Union and AISLIC insureds.

9        Indeed, as Plaintiff points out, the Panel Counsel list is nothing more than a list of firms

10   that are pre-authorized by National Union and AISLIC to represent its insureds.  This "pre-

11   authorization" does not in any way create an attorney-client relationship, nor does it suggest that

12   AIG has retained the firm as its attorney before a case comes into existence.  Just because

13   National Union and AISLIC have agreed to place Heller Ehrman on its Panel Counsel list as a

14   firm that *may* be selected by its insureds creates neither an attorney-client relationship nor any

15   type of conflict that would warrant disqualification.

16       In support of its position, Defendant cites <u>Gulf Ins. Co. v. Berger, Khan, Shafton, Moss,</u>

17   <u>Figler, Simon & Gladstone</u>, 79 Cal.App.4th 114 (2000).  There, the court found an attorney-

18   client relationship where the insured had tendered the defense to its insurer and <u>the insurer</u>

19   <u>assumed the defense</u> by making the insured's counsel sign the insurance company's standard

20   retainer agreement, setting its rates, and requiring the firm to conduct the defense in accordance

21   with its litigation management guidelines and provide it with litigation budgets, workplans,

22   settlement analyses, and legal research.  <u>Id.</u> at 121-122, 126-127.  Even though the insurer

23   accepted the defense under a reservation of rights and the insured never sought *Cumis* counsel,

24   the court found the circumstances sufficient to demonstrate an attorney-client relationship.

25

26       [2] As previously explained, Plaintiff's EPLI policy at issue in this litigation departs from this, but even under
27   that policy, AISLIC disclaims any duty to defend and/or duty to pay defense costs until the insured has expended a
     $1 million self-insured retention.  In the remainder of this decision, when the Court refers to the policies at issue, it
28   indirectly references this caveat.

The instant case is distinguishable from Gulf.  There, unlike the policies here, the insured tendered the defense to the insurer under a duty to defend.  Under those circumstances, the typical tripartite relationship exists where the insurance company assumes the defense on behalf of the insured and exercises significant control over the insured's attorneys as part of assuming control over the strategic decisions of the case.  Here, the policies at issue assume only a duty to pay defense costs, not a duty to defend.  The defenses could not be tendered to the insurer and thus the insurer could not exert any control over the defense, other than the "limited control" described in Stites that does not create an attorney client relationship.

Finally, it is worth nothing that in 1992, when Heller Ehrman was added to the Panel Counsel list, and throughout the time it was included on the list, Heller Ehrman was adverse to AIG, Inc. companies in dozens of lawsuits pending against these entities.  Declaration of Nancy Sher Cohen, ¶ 10.[3]  Of course, National Union and AISLIC knew of this when it added Heller Ehrman to the list, however no conflict was asserted until May 2005.  Declaration of Norman J. Blears ("Blears Dec."), ¶ 9.  In support of the finding that AIG, Inc. and its member companies were aware of this adverse representation, Heller Ehrman explains that AIG, Inc. and/or its member companies have provided Heller Ehrman with numerous Conflicts Waiver Letters sent when Heller Ehrman makes a lateral hire from a firm that had represented AIG, Inc. or any corporate affiliate.  Declaration of Jennifer Boehler ("Boehler Dec."), ¶ 2.  These letters explain that Heller Ehrman "routinely" represents policyholders in matters adverse to AIG and "expects to continue doing so."  Exhibits A-D, attached to Boehler Dec.

Defendant next argues that "assurances" given to Mr. Santoro, who oversees the Panel Counsel list, establish an attorney-client relationship.  Although the parties remember the specific facts of the conversation differently, the following facts are clear.  In mid-2002, Heller Ehrman

---

[3] Defendant has filed objections to many of Plaintiff's declarations in support of its opposition.  However, the Court does not rely on any of the allegedly objectionable portions identified by Defendant and will therefore not address the objections.

Plaintiff has also filed objections to evidence, specifically the Declaration of Yera Patel, submitted in support of Defendant's motion.  As the Court does not rely on any of Ms. Patel's statements, the Court will not address the objections.

was removed from the Panel Counsel list because of AIG's displeasure over Heller Ehrman's bad faith actions.  Blears Dec., ¶¶ 5, 6; Declaration of Anthony M. Santoro, Jr. ("Santoro Dec."), ¶ 5. Mr. Blears, a shareholder of Heller Ehrman, discussed Heller Ehrman's deletion with Mr. Santoro.  Blears Dec., ¶ 6, Santoro Dec., ¶ 6.  In 2004, Heller Ehrman was placed back on the Panel Counsel list.  Santoro Dec., ¶ 6.

The disputed facts concern certain the circumstances under which Heller Ehrman was placed back on the Panel Counsel list.  According to Mr. Santoro, Mr. Blears contacted him in late 2003 or early 2004 and requested that Heller Ehrman be placed back on the list.  Santoro Dec., ¶ 6.  At that time, Mr. Santoro contends that Mr. Blears "assured me that his firm would not be pursuing coverage and bad faith actions against National Union, AISLIC or other AIG, Inc. companies."  Santoro Dec., ¶ 6.  Based on this assurance, Mr. Santoro agreed to put Heller Ehrman back on the list.  Santoro Dec., ¶ 6.

Mr. Blears recalls the facts somewhat differently.  He declares that in October 2002, he and another member of Heller Ehrman's Securities Litigation Practice Group met with Mr. Santoro and other representatives of AIG in New York City to discuss Heller Ehrman's removal. Blears Dec., ¶ 6.  During the meeting, "AIG representatives acknowledged that it was appropriate for panel counsel to negotiate and, if necessary, litigate coverage terms on D&O policies but that in their view accusations of bad faith on D&O matters were inappropriate."  Blears Dec., ¶ 6. Mr. Blears states that he did not, at any time, inform anyone at AIG that Heller Ehrman would not pursue any coverage or bad faith actions against National Union, AISLIC or other AIG, Inc. company.  Blears Dec., ¶ 8.  Rather, his discussions with Mr. Santoro were limited to D&O policies.  Blears Dec., ¶ 8.  It was his understanding that Heller Ehrman would negotiate and, if necessary, litigate, coverage matters for D&O policies.  Blears Dec., ¶ 8.  However, Heller Ehrman made an independent, unilateral decision not to undertake to represent clients pursuing D&O bad faith actions against AIG companies, and that clients considering D&O bad faith actions would be referred to other firms.  Blears Dec., ¶ 8.  He informed Mr. Santoro of this decision in late 2002 or early 2003.  Blears Dec., ¶ 8.  Mr. Blears believes that, consistent with

this decision, Heller Ehrman has not filed any further bad faith claims against AIG companies in connection with D&O policies.  Blears Dec., ¶ 8.

In support of Defendant's reply, Mr. Santoro submitted a supplemental declaration in which he states that, "without agreeing or disagreeing with all or any part of Mr. Blears' version of the conversation, I do note that in my discussions with Mr. Blears, I made no distinction between AIGDC Financial Lines' displeasure with and considered inappropriateness of (1) pursuit of bad faith actions against AIG member companies on D&O policies and (2) on claims under other policies such as EPLI claim which are also handled by AIGDC Financial Lines Division.  Supplemental Declaration of Anthony M. Santoro, Jr., ¶ 3.

Under either version of the events surrounding Heller Ehrman's reinstatement to the Panel Counsel list, the "assurances" given do not create an attorney-client relationship.  As Plaintiff argues, "We will not sue you," is certainly not tantamount to the commitment, "We will be your lawyers."  Opposition, at 30.  Although these "assurances," whatever they may be, may be the basis for a breach of an oral agreement claim, they certainly do not create an attorney-client relationship as no legal advice was sought or exchanged.  Defense counsel conceded this during oral argument.  Transcript of July 8, 2005 ("Trans."), hearing, at 15.  Counsel also concedes that there is no evidence of any legal advice sought or given in connection with Mr. Blears' communications.  Trans. at 15.  Moreover, and quite tellingly, Mr. Santoro never indicated during these discussions that he believed that an attorney-client relationship existed, so as to very clearly make any suit brought by Heller Ehrman improper.  Rather, Heller Ehrman's removal was based on its "coverage practice which involved suing insurance companies in coverage and bad faith actions..."  Santoro Dec., ¶ 5.

Defendant next relies on the Litigation Guidelines to establish the existence of an attorney-client relationship.  Defendant argues that, as Panel Counsel, Heller Ehrman "has been furnished and is expected to follow 'The AIG Companies Litigation Management Guidelines.'"  Santoro Dec., ¶ 9.  The Litigation Guidelines set forth litigation management guidelines "for all counsel retained by an American International Group, Inc. member company..."  Litigation

Guidelines, at 2, attached as Exhibit A to Santoro Dec.  As Defendant explains, the Litigation

Guidelines set forth a litigation roadmap for retained counsel to follow, including an "agreed to

litigation plan" and budget, and information on how to handle settlement activities, including

settlement conferences, mediations and arbitrations.  Litigation Guidelines, at 3, 9.  The

Litigation Guidelines also envision "active communication between the claims professional and

defense counsel, coordination of activities, [and] collaborative decision-making. . ."  Litigation

Guidelines, at 2.

By virtue of the principles outlined in the Litigation Guidelines, Defendant argues that

Heller Ehrman is "expected to and [does] communicate, both orally and in writing, with AIGDC

claims personnel in the Financial Institutions Department."  Motion, at 7.  Defendant contends

that these communications are considered confidential by AIGDC, Heller Ehrman and the

insureds.  Defendant further contends that, during these communications, "key aspects of

AIGDC's organizational structure and its internal methods and practices of handling claims are

and will be revealed, as well as other matters of a confidential nature."  Motion, at 7.  Defendant

also points out that Heller Ehrman never objected to "AIGDC's request that it follow the AIG,

Inc. Litigation Management Guidelines. . ."  Motion, at 7.

Even assuming that the Litigation Guidelines are applicable to Heller Ehrman and that

they are not discoverable, they do not create an attorney-client relationship.  Defendant's

argument is based mainly on speculation- it argues that because the Litigation Guidelines call for

certain actions and behavior, Heller Ehrman must have engaged in such actions and behavior,

which in turn gave rise to an attorney-client relationship.  Indeed, during oral argument, counsel

for Defendant conceded that he could not identify requests for legal advice in any conversation

between Heller Ehrman and the claims representatives.  Transcript of July 8, 2005, hearing, at 14.

This argument is strained, at best, and is based on unsupported leaps in logic.  See DCH Health

Servs. Corp. v. Waite, 95 Cal.App.4th 829, 833 (2002) ("Speculative contentions of conflict of

interest cannot justify disqualification of counsel.") (citations omitted).

Nor does Defendant identify any confidential communications of the type that create an attorney-client relationship.  The only communications identified as confidential by Defendant is a set of "direct dealings and communications," regarding the In re Opal Concepts, Inc. ("Opal Concepts") litigation, between Heller Ehrman attorneys and Financial Lines Department claims representative Francesca Sieni.  According to Ms. Sieni, these communications included "discussions regarding defenses, strategy, further handling and possible settlement and approaches thereto."  Supplemental Declaration of Francesca Sieni, ¶ 2.  The mere discussion of what is happening in a case, however, does not make Ms. Sieni, or AIGDC, a client.  See Assurance Co. of Am. v. Haven, 32 Cal.App.4th 78, 87-89 (1995).

Indeed, Carren Shulman, the Heller Ehrman attorney who communicated with Ms. Siena in connection with the Opal Concepts case, declares that their communications "exclusively concerned Heller Ehrman's representation of the Opal Directors" in their related adversary proceeding - "i.e., the defenses the Opal Directors may raise in the Proceeding, strategy regarding the Proceeding (for example, motions that we planned to file), and possible settlement of the Creditor's Committee's claims against the Opal Directors."  Declaration of Carren Shulman ("Shulman Dec."), ¶ 9.  Ms. Shulman explains that she provided this information "simply to keep Ms. Sieni apprised of developments in the Proceeding," and that she has not, at any time, had discussions regarding National Union's or any affiliates' confidential positions or strategy with respect to the Opal Directors' claims for insurance coverage from National Union."  Shulman Dec., ¶¶ 9,10.

Second, contrary to Defendant's suggestion, the evidence in the record suggests that Heller Ehrman did not agree to follow the Litigation Guidelines.  Although the term "Litigation Guidelines" is not specifically used, a letter written by Heller Ehrman shareholder Paul W. Sugarman makes clear that he refuses to follow AISLIC's "billing guidelines" and "payment protocols."  Exhibit A, attached to Declaration of Paul W. Sugarman (written in 2001 in connection with Mr. Sugarman's position as lead defense counsel for Behr Process Corporation, and addressed to counsel for two of Behr's insurers, AISLIC and Zurich American Insurance

Company).  Heller Ehrman attorney Carren Shulman also explains that, in her representation of

the Opal Concepts Directors, she received a copy of the Litigation Guidelines but never agreed,

orally or in writing, to comply with them.  Shulman Dec., ¶ 12.[4]  Finally, there is nothing in the

Guidelines that purports to create an attorney-client relationship with a Panel Counsel firm that

has not been retained by an AIG, Inc. company, but instead represents the insured under a policy

for which there is no duty to defend.

Finally, insofar as Defendant contends that the Litigation Guidelines disclose the

"organizational structure" and other methods of internal claim handling and litigation

philosophy, the disclosure of such information does not create an attorney-client relationship.

First, although Defendant contends that this information is confidential,[5] Plaintiff provides

evidence that suggests that most, if not all, of the information is either publicly available or not

held out by AIG, Inc. as confidential information.  Declaration of David B. Goodwin, ¶¶ 27-28

(explaining that the organizational structure of AIG is available on its website and that

information concerning AIG's internal methods of handling claims is routinely discussed with

coverage counsel); Declaration of Martin H. Myers,  ¶¶ 11-13 (explaining that during depositions

in an unrelated pending case, he deposed AIG attorney Tom Kopp about AIG claims handling

policies, practices and procedures, without objection).

Even assuming this information was confidential (proprietary), it would not somehow

create an attorney-client relationship absent evidence that the information was used to secure

legal advice.  See eg., In re Imperial Corp. of America, 167 F.R.D. 447, 452 (S.D. Cal. 1995)

(holding that where an insured communicates with an insurer for purposes related to seeking

coverage, rather than seeking legal advice, there is not attorney-client privilege).  There is no

such evidence here.

---

[4] Ms. Shulman further explains that Ms. Sieni requested that Heller Ehrman act in compliance with the
Litigation Guidelines only after Defendant filed the instant motion to disqualify.  Shulman Dec., ¶ 12.

[5] While the information might be proprietary there is nothing in the record to suggest that it is a confidential
attorney/client communication.

b.      *Actual Cases in which Heller Ehrman is Involved*

As an alternate basis for finding an attorney-client relationship, Defendant points to Heller Ehrman's capacity as defense counsel on several specific cases.  In connection with these cases, Defendant contends that Heller Ehrman had direct, confidential communications with claims representatives in the Financial Institutions Department of AIGDC, which is the same department handling the underlying Parker matter.  According to Defendant, "at the management level, the present claim is being managed by the same individuals who serve in management roles in connection with claims made in the [specific cases] and in connection with claims to be made in the future under D&O type and EPLI policies on which Heller, Ehrman is listed as Panel Counsel."  Motion, at 10-11.

Although Defendant cites numerous cases, it relies mainly on two cases in which Heller Ehrman is acting as defense counsel- Porcile v. Bank of America ("Porcile") and Opal Concepts."[6]  Defendant contends that in its capacity as defense counsel in these two cases, Heller Ehrman "is expected to regularly communicate, both in writing and telephonically, with AIGDC claims personnel in the Financial Institutions Department, pursuant to the 'AIG Companies Litigation Management Guidelines.'"  Motion, at 38.

Defendant is correct that Heller Ehrman is lead defense counsel in both the Porcile and Opal Concepts case, each of which arises under policies issued by National Union.  Shulman Dec., ¶¶ 2, 3; Thompson Dec., ¶¶ 2, 4.  In Opal Concepts, National Union has agreed to pay defense costs under a reservation of rights.  Shulman Dec., ¶ 6.  In Porcile, however, the insured has been paying Heller Ehrman's legal bills.  Thompson, ¶ 5.

---

[6] The declarations of various Heller Ehrman attorneys submitted in opposition to the motion establish that many of the cases cited by Defendant do not support its argument.  In most of the cases cited, either Heller Ehrman did not represent the insured, AIG hired separate counsel, coverage was denied and not contested, and/or AIG has never agreed to provide coverage.  See Declaration of Alan Jacobs ("Jacobs Dec."), ¶ 3-8; Declaration of Carol Lynn Thompson ("Thompson Dec."), ¶ 11; Declaration of Robert W. Bell, ¶ 5-6; Goodwin Dec., ¶¶ 19, 22, Declaration of Kevin J. Toner ("Toner Dec."), ¶¶ 3-4, 13-18; Declaration of Patricia K. Gillette ("Gillette Dec."), ¶¶ 5-9; Declaration of Andrew R. Livingston ("Livingston Dec."), ¶¶ 4-9.  Moreover, in many cases, the insured, not AIG, has paid the legal bills.  Jacobs Dec., ¶ 11; Thompson Dec., ¶¶ 5, 12; Gillette Dec., ¶ 6; Livingston Dec., ¶ 6; Toner Dec., ¶ 4.

1    To the extent that Defendant's argument is based on speculative exchanges of

2  confidential information as "envisioned" by the Litigation Guidelines, this argument fails.

3  Defendant asks this Court to find a conflict of interest based on Heller Ehrman "presumptive"

4  receipt of confidential information.  Motion, at 39.  As explained above, the Court will not

5  assume the existence of confidential information so as to impose an attorney-client relationship.

6  In fact, in the <u>Porcile</u> case, there has been *no* correspondence between Heller Ehrman and

7  National Union, or any other AIG company.  Thompson Dec., ¶ 6.  Moreover, as the Court has

8  explained, any communications regarding the <u>Opal Concepts</u> matter were proper discussions

9  made to keep the insurer aware of the status of the proceedings.

10    Accordingly, the Court finds that no attorney-client relationship exists between Heller

11  Ehrman and any AIG, Inc. member company.

12    2.    Expectation of Fidelity

13

14    If the Court failed to find the existence of an attorney-client relationship, Defendant urges

15  the Court to disqualify Heller Ehrman based on an expectation of fidelity, created from all of the

16  circumstances asserted by Defendant and described throughout this opinion.

17    Insofar as Defendants relies on the "assurances" described above to support its

18  contention, its argument fails.  As the Court has explained, any promise not to sue AIG,

19  assuming one was made, and/or the resulting expectations do not create an attorney-client

20  relationship.  That AIG is bound by the Panel Counsel list does not change this.  Moreover, any

21  expectation of fidelity between panel counsel and an insurer does not necessarily create the same

22  expectation of fidelity between the attorney and a client.

23    Defendant also relies on the "presumptive" communications envisioned by the Litigation

24  Guidelines, and argues that even if an attorney-client relationship doesn't exist, a conflict of

25  interest may arise if the attorney is in a position to acquire confidential information from a non-

26  client which may be useful in the attorney's representation of the client.  <u>Tri-Growth Centre City,</u>

27  <u>Ltd. v. Silldorf, Burdman, Duignan & Eisenberg</u>, 216 Cal.App.3d 1139, 1151.  Defendant again

28  points to the Litigation Guidelines and the information contained therein to support its argument

that Heller Ehrman received confidential information.  Defendant explains that, in addition to the

information regarding AIG's litigation philosophy, the Litigation Guidelines contain protocols

for attendance at settlement conferences and mediations, a subject which is at issue in the FAC.

At the hearing, the Court pointed out that the Litigation Guidelines likely only apply to the

underlying dispute, not to a coverage action such as this.  Defendant explained that there was a

"general philosophy" about attendance at mediation, and that receiving this information through

the Litigation Guidelines gives Heller Ehrman a "seed" which they can exploit during discovery

in the instant case.  Trans. at 38.  Defendant characterized this as a "headstart" in discovery, and

argued that this use of the information created a conflict of interest pursuant to the Tri-Growth

case.  Trans. at 39.

    First, as the Court explained at the hearing, any "headstart" really isn't relevant if the

information is discoverable, and therefore not confidential, in this bad faith coverage action.

Indeed, discovery in most, if not all, bad faith actions begins with receipt of the claims handling

manual, which would make the information contained therein not confidential.  Discovery of this

information would, assuming a "headstart," put the parties back on even terrain.

    Second, as with many of Defendant's arguments, it is rooted in pure speculation.

Defendant's arguments are couched in terms of "can" and "may," and "presume" and "expect."

Given the substantial prejudice that would befall Plaintiff if this Court disqualified its counsel,

the Court cannot, and will not, base a determination to disqualify counsel on little more than thin

air.

    Accordingly, the Court finds that there is no conflict of interest sufficient to justify

disqualification of Heller Ehrman.[7]  Defendant's motion to disqualify and for a protective order

is DENIED.

---

[7] Because the Court found that a conflict of interest does not exist, it will not analyze Defendant's waiver argument or any issues relating to whether AIG Inc. companies are affiliates for conflict of interest purposes.

PLAINTIFF'S MOTION TO COMPEL

Plaintiff moves to compel the production of (1) AISLIC 30(b )(6) witnesses and (2) Kathleen Brady, claims representative for AIGDC, for depositions.

A.    Legal Standard

Federal Rule of Civil Procedure 37(d) provides that if a party, or person designated under Rule 30(b)(6), fails to attend a deposition after being served with proper notice, the Court may make any orders "as are just," including the imposition of sanctions.  Rule 37(d) further provides that the "court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

B.    Analysis

Plaintiff's motion to compel is based on Defendant's refusal to produce witnesses because of its allegation of a conflict of interest.  As explained above, on May 11, 2005, while preparing Zachary Fisher, AISLIC's 30(b)(6) witness, for deposition, Mr. Wagoner states that he first discovered the alleged conflict.  The same day, Mr. Wagoner contacted Mr. Myers, while he was at the San Francisco airport, and demanded that Heller Ehrman withdraw as counsel.  Mr. Myers refused and continued his travel to New York City.[8]

On May 12, 2005, Mr. Myers and Mr. Wagoner appeared for the deposition.  However, there was no witness.

As the Court has determined that there is no conflict of interest to support Heller Ehrman's disqualification, Plaintiff's motion is granted.  Given the circumstances surrounding the cancellation of the depositions, the Court must discuss the issue of sanctions.

---

[8] Mr. Myers and Mr. Wagoner remember the facts surrounding these conversations quite differently.  The exact nature of their discussions, however, is not relevant to the Court's analysis.

1      Plaintiff requests that the Court order that the 30(b)(6) deposition of AISLIC and the

2 deposition of Kathleen Brady[9] be taken at the San Francisco offices of Heller Ehrman.  Plaintiff

3 also requests an award of not less than $14,000.00 ($8,000.00 in attorneys fees, costs and

4 expenses related to the cancelled deposition and $6,000.00 in attorneys fees in connection with

5 this motion to compel).

6      While the Court recognizes that certain situations may require immediate action such as

7 the unilateral cancellation of depositions without Court intervention, the circumstances here do

8 not warrant the action taken.  Although Mr. Wagoner may not have discovered the alleged basis

9 for the conflict until May 11, 2005, it is hard to imagine that Mr. Wagoner's client, a

10 sophisticated business entity with experienced in-house attorneys, was unaware of the situation

11 until that date.  In fact, the evidence described throughout this opinion suggests the contrary is

12 true- that AIG, Inc. entities have known for quite some time that Heller Ehrman represents clients

13 with adverse interests.  Additionally, calling opposing counsel, while counsel is at the airport en

14 route to a properly scheduled deposition, to assert a conflict, demand withdrawal, and unilaterally

15 cancel the deposition, is neither proper nor professional.

16      The circumstances surrounding the 30(b)(6) deposition cancellation warrant the

17 imposition of sanctions.  First, the Court orders Defendant to produce the AISLIC 30(b)(6)

18 witness(es) and Kathleen Brady for depositions at Heller Ehrman's San Francisco offices, at a

19 date and time selected by Plaintiff.  Second, giving Mr. Wagoner the benefit of the doubt, the

20 Court awards sanctions in an amount not less than $14,000.00 against Defendants American

21 International Specialty Lines Insurance Company and AIG Technical Services.  Plaintiff shall

22 provide the Court with a declaration setting forth specific amounts within ten (10) days of the

23 date of this order.

24

25

26

27

28      [9] Plaintiff's motion seeks to compel the properly noticed deposition of Kathleen Brady because, if not for Defendant's motion to compel, it would have been taken already.

<u>ORDER</u>

IT IS HEREBY ORDERED that,

1.      Defendant's motion to disqualify and for protective order is DENIED;

2.      Plaintiff's motion to compel is GRANTED;

3.      Defendant is ORDERED to produce AISLIC's 30(b)(6) witness(es) and Kathleen
Brady for deposition at Heller Ehrman's San Francisco office, at a time and date
selected by Plaintiff;

4.      Sanctions in the amount of not less than $14,000.00 are awarded against
Defendants American International Specialty Lines Insurance Company and AIG
Technical Services; and

5.      Plaintiff SHALL provide the Court with a declaration setting forth specific
amounts within ten (10) days of the date of service of this order.

IT IS SO ORDERED.

**Dated:   July 19, 2005**                                **/s/ Dennis L. Beck**
9b0hie                                         UNITED STATES MAGISTRATE JUDGE